**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT NEW YORK**

| | |
|---|---|
| JOHN FARLEY, and MICHAEL FOX, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | **CIVIL ACTION NO:** |
| against | **CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| BETFAIR INTERACTIVE US LLC d/b/a FANDUEL SPORTSBOOK, FANDUEL, INC., FANDUEL GROUP PARENT LLC, FLUTTER ENTERTAINMENT PLC, and DRAFTKINGS INC., | |
| Defendants. | |
| . | |

Plaintiffs John Farley, and Michael Fox ("Plaintiffs"), individually and on behalf of all others similarly situated, respectfully bring this Class Action Complaint against Defendants Betfair Interactive US LLC d/b/a FanDuel Sportsbook, FanDuel, Inc., FanDuel Group Parent LLC, Flutter Entertainment plc (collectively, "FanDuel"), and DraftKings Inc. (together with FanDuel, "Defendants"). Plaintiffs allege, upon personal knowledge as to their own conduct and experiences, and upon information and belief as to all other matters, based on, among other things, the investigation of counsel and review of public documents, as follows:

**INTRODUCTION**

1.      This is a class action arising from Defendants' systematic use of online sportsbook platforms designed not merely to facilitate lawful sports wagering, but to maximize user engagement, repeated betting, and customer losses through a coordinated system of live and in-game betting, personalized promotions, frictionless redepositing, and aggressive retention tactics.

1

2.      Through their sportsbook apps and related digital marketing systems, Defendants FanDuel and DraftKings transformed sports gambling from an occasional, event-based activity into a high-frequency, always-available, app-driven product engineered to keep customers wagering continuously.

3.      Unlike traditional sports betting, which historically involved discrete wagers placed before the start of a game, Defendants' platforms encourage users to place repeated live and in-game bets during the course of a sporting event, often within seconds or minutes of prior wagers resolving.

4.      Defendants reinforced this high-frequency betting environment with a steady stream of inducements, including "profit boosts," bonus bets, money-back offers, cash-back promotions, refund offers, and other time-sensitive incentives designed to make continued wagering appear more attractive, less risky, and harder to resist.

5.      Defendants also used targeted emails, texts, app notifications, and other direct outreach to re-engage users, prompt additional deposits, and drive customers back into active betting sessions, including after losses and during periods of heightened vulnerability.

6.      On information and belief, these promotional practices were not incidental to Defendants' business. They were central to it. Defendants used customer data, betting history, and behavioral patterns to increase betting frequency, extend platform use, encourage loss-chasing, and generate additional revenue from users whose gambling activity was escalating.

7.      Plaintiffs and members of the proposed Class were exposed to these common practices through materially similar sportsbook products, standardized promotional programs, and uniform digital inducement strategies employed by Defendants across the United States.

8.     As a direct and foreseeable result of Defendants' conduct, Plaintiffs and Class members suffered economic injury, including substantial gambling losses, repeated deposits, loss of use of money, and other financial harm.

9.     Many Class members also suffered consequential personal harms associated with compulsive sportsbook gambling, including anxiety, stress, secrecy, relationship strain, and the pressure to continue betting in an effort to recover prior losses.

10.     Defendants profited from this conduct by increasing the number, frequency, and speed of wagers placed on their platforms, increasing customer retention, and increasing the amount of money deposited and lost by users on FanDuel and DraftKings sportsbook products.

11.      Plaintiffs bring this action individually and on behalf of all others similarly situated to recover damages, restitution, disgorgement, declaratory and injunctive relief, and all other remedies permitted by law arising from Defendants' unlawful, unfair, deceptive, and inequitable conduct.

12.     Through this action, Plaintiffs seek to hold Defendants accountable for the common course of conduct alleged herein and to obtain relief for the thousands of consumers who were injured by Defendants' aggressive and systematically deployed sportsbook practices.

## **JURISDICTION AND VENUE**

13.     Plaintiffs incorporate all previous paragraphs as asserted herein.

14.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members of the proposed Class, and at least one member of the proposed Class is a citizen of a state different from at least one Defendant.

15.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) to the extent complete diversity exists between Plaintiffs and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

16.     This Court has personal jurisdiction over Defendants because, inter alia, Defendants transact substantial business in New York, purposefully direct their conduct toward New York residents, derive substantial revenue from business conducted in New York, and committed the wrongful acts alleged herein in and directed to this District.

17.     Personal jurisdiction is further proper because Defendants marketed, offered, distributed, operated, and profited from online sportsbook products in New York, including within this District, and the claims asserted herein arise out of and relate directly to those contacts.

18.     Plaintiffs reside in New York and, during the relevant period, used one or more of Defendants' sportsbook platforms in New York, was exposed to Defendants' promotional conduct in New York, deposited funds and placed wagers in New York, and suffered injury in New York.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

20.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because one or more Defendants reside in this District for venue purposes and are subject to the Court's personal jurisdiction with respect to this action.

21.     In addition, venue is proper because Defendants purposefully availed themselves of the privilege of conducting business in this District by marketing and operating sportsbook applications for New York consumers, sending promotional communications into this District,

accepting deposits from users in this District, and deriving substantial revenue from wagering activity occurring in this District.

22.    To the extent any Defendant contends that any agreement purports to select New York, New York as the forum for litigation not subject to arbitration, this District is a proper and appropriate forum for the adjudication of this dispute.

## **PARTIES**

23.    Plaintiffs incorporate all previous paragraphs as asserted herein.

24.    Plaintiffs are natural persons who, during the relevant period, opened and maintained sportsbook accounts with one or both FanDuel and DraftKings platforms, received promotional communications and inducements from Defendants, deposited funds and placed wagers through Defendants' sportsbook apps, and suffered the injuries alleged herein.

25.    Plaintiff John Farley is a natural person and resident citizen of the State of New York. During the relevant period, he used Defendants' sportsbook products in New York, primarily FanDuel, received promotions in New York, deposited funds and placed wagers in New York, and suffered injury in New York.

26.    Plaintiff Farley primarily used FanDuel, although he also maintained an account with DraftKings.

27.    Plaintiff Farley's engagement with FanDuel began after FanDuel launched online sportsbook operations in New York. Thereafter, Plaintiff was exposed to repeated promotional inducements, including but not limited to cash-back offers, bonus-bet offers, profit boosts, and bet-refund promotions, which encouraged him to continue wagering on Defendants' sportsbook platforms.

28. Plaintiff Michael Fox is a natural person and resident citizen of the State of New York. During the relevant period, he used Defendants' sportsbook products in New York, primarily DraftKings, received promotional offers and communications in New York, deposited funds and placed wagers in New York, and suffered injury in New York.

29. Plaintiff Fox was exposed to repeated promotional inducements, including but not limited to profit boosts, and bet-refund promotions, which encouraged him to continue wagering on Defendants' sportsbook platforms.

30. Defendant Betfair Interactive US LLC does business as FanDuel Sportsbook and, on information and belief, operates and/or causes to be operated the FanDuel Sportsbook products used by consumers in New York and throughout the United States. FanDuel's sportsbook terms and New York house rules identify Betfair Interactive US LLC as the FanDuel sportsbook operator.

31. Defendant FanDuel, Inc. is, on information and belief, a Delaware corporation with principal executive offices at 300 Park Avenue South, 14th Floor, New York, New York 10010. FanDuel's own terms identify FanDuel, Inc. as the contracting entity for U.S. residents for certain FanDuel services and list the foregoing New York address for notices and arbitration opt-outs.

32. Defendant FanDuel Group Parent LLC is, on information and belief, a Delaware limited liability company with principal executive offices in New York, New York, and is the parent or affiliated entity of one or more FanDuel operating companies involved in the marketing, operation, control, and profitability of the FanDuel sportsbook platform.

33. Defendant Flutter Entertainment PLC is, on information and belief, the ultimate parent company of the FanDuel enterprise and a public limited company whose principal executive

6

office is located in New York. Flutter's 2025 Annual Report states that its principal executive office is located in leased office space in New York.

34.    At all relevant times, the FanDuel Defendants marketed, promoted, distributed, managed, controlled, and/or profited from the FanDuel sportsbook platform, including the sportsbook products offered to Plaintiffs and members of the proposed Class in New York.

35.    Defendant DraftKings Inc. is a Nevada corporation with its principal executive offices at 222 Berkeley Street, 5th Floor, Boston, Massachusetts 02116. DraftKings' 2025 Annual Report identifies that address as its principal executive offices and states that its corporate headquarters is located in Boston, Massachusetts.

36.    On information and belief, DraftKings Inc. operates, controls, markets, and profits from the DraftKings sportsbook platform offered to consumers in New York and throughout the United States, whether directly or through subsidiaries, affiliates, or licensed operating entities.

37.    At all relevant times, Defendants transacted substantial business in New York and this District, purposefully directed promotional conduct and sportsbook services into New York, accepted deposits from New York users, facilitated wagers by New York users, and derived substantial revenue from consumers located in New York.

## FACTUAL ALLEGATIONS

38.    Plaintiffs incorporate all previous paragraphs as asserted herein.

**A. FanDuel and DraftKings transformed sports betting into a continuous, app-based wagering product.**

39.    Historically, sports betting was a more limited and episodic activity. Bettors generally placed wagers before a sporting event began, on a narrower set of outcomes, and then waited until the event or a substantial portion of it concluded to learn the result.

40.    Defendants FanDuel and DraftKings materially changed that model by offering sportsbook products through mobile applications and online platforms that allow users to deposit money instantly, place wagers from virtually anywhere, and continue betting throughout the course of a live sporting event.

41.    Through these app-based sportsbook platforms, Defendants transformed sports betting from a discrete event-based activity into a rapid, high-frequency, always-available wagering product.

42.    Defendants' sportsbook platforms were designed to reduce the natural pauses and friction that historically limited sports betting activity, including the need to travel to a physical sportsbook, wait in line, place a single wager through a human ticket writer, or wait until a game ended before placing additional bets.

43.    Instead, Defendants' platforms allow users to fund accounts electronically, place wagers with a few taps on a smartphone, and move immediately from one bet to another without any meaningful interruption.

44.    Defendants further designed their platforms to maximize user engagement by continuously displaying new betting opportunities, changing odds in real time, highlighting time-sensitive offers, and encouraging users to remain active on the application during live sporting events.

45.    These product features did not merely make sports betting more convenient. They materially increased the speed, volume, and frequency of wagers that users could place and increased the likelihood that users would continue betting for longer periods of time and in larger amounts than they originally intended.

**B. Defendants' platforms promoted live and in-game betting as a central feature of the sportsbook experience.**

46. Plaintiffs incorporate the previous paragraphs as if fully set forth herein.

47. A central feature of Defendants' sportsbook products is live or in-game betting.

48. Live or in-game betting allows users to place wagers after a sporting event has already begun, including repeated wagers during the course of the same game.

49. Through live betting, users may wager not only on the final outcome of a game, but also on intermediate and constantly changing events, conditions, or player outcomes as the game unfolds.

50. This format permits repeated wagering over short intervals, often within seconds or minutes of a prior wager resolving.

51. On information and belief, Defendants prominently featured, promoted, and prioritized live and in-game betting because such betting increased user engagement, increased the number of wagers placed per session, and increased revenue generated from user losses.

52. The design of Defendants' platforms encouraged users to remain inside the app during live sporting events and continue betting as odds changed, events developed, and new opportunities appeared.

53. Defendants' platforms also prominently featured parlays, same-game parlays, player props, and other wager combinations that increased the number of betting opportunities presented to users and encouraged users to link multiple wagers together into a single betting session.

54. The result was an environment in which users were encouraged not merely to place a single sports wager, but to engage in repeated, escalating betting activity during the same game or same period of sports viewing.

9

**C. Defendants used promotional inducements and targeted outreach to encourage continued betting and additional deposits.**

55.    Plaintiffs incorporate the previous paragraphs as if fully set forth herein.

56.    Defendants did not rely solely on the availability of betting opportunities to generate wagering activity.

57.    Defendants also used a broad array of promotions, inducements, and targeted outreach to encourage users to open accounts, place initial bets, continue betting, return after inactivity, increase the amount wagered, and make additional deposits.

58.    These inducements included, among other things, profit boosts, bonus bets, "bet and get" offers, cash-back offers, money-back or "no sweat" bets, bet refunds, odds boosts, deposit incentives, and other limited-time promotions.

59.    Defendants presented these promotions through emails, text messages, push notifications, in-app alerts, and other direct communications.

60.    On information and belief, Defendants used user account information, betting history, deposit behavior, engagement metrics, and other behavioral data to decide when and how to send such promotions.

61.    These communications were designed to create urgency, encourage immediate action, and make further wagering appear attractive, time-sensitive, or less risky than it actually was.

62.    Defendants' promotional communications routinely highlighted supposed benefits, increased returns, limited-time opportunities, or partial downside protection while encouraging users to continue betting.

63.    By repeatedly sending such communications to users who had already demonstrated a willingness to wager, deposit funds, or chase losses, Defendants increased the

likelihood that users would continue gambling and would do so in larger amounts and with greater frequency.

64.    On information and belief, Defendants' promotional practices were standardized, systematic, and widely deployed across their user base, including in New York.

**D. Defendants' platforms made it easy to deposit and continue wagering while making it difficult for users to disengage.**

65.    Plaintiffs incorporate the previous paragraphs as if fully set forth herein.

66.    Defendants' sportsbook products were designed to make wagering activity frictionless.

67.    Users could deposit funds quickly using linked payment methods and then place bets almost immediately after funding an account.

68.    Once a user was active on the platform, Defendants continually presented additional betting opportunities, changing odds, promotions, and wager combinations intended to keep the user engaged.

69.    These features reduced the likelihood that users would pause and reconsider their betting activity after losses.

70.    Instead, the platforms encouraged users to continue betting in an attempt to recover losses, capitalize on promotions, or take advantage of newly presented opportunities.

71.    On information and belief, Defendants profited from users who engaged in repeated deposit activity, continued betting after losses, and remained active on the apps for extended periods.

72.    Some users also experienced difficulty withdrawing funds, delays in accessing balances, or friction in moving money out of the platform, all of which increased the likelihood that funds would remain in the betting ecosystem and be wagered again.

73.    Defendants knew or should have known that these product and marketing features would foreseeably increase compulsive or loss-chasing behavior among a segment of their users.

**E. Defendants' conduct caused widespread economic and related harm to users.**

74.    Plaintiffs incorporate the previous paragraphs as if fully set forth herein.

75.    As a direct and proximate result of Defendants' conduct, users incurred substantial economic losses through repeated wagers, repeated deposits, and prolonged betting activity.

76.    Users also suffered loss of use of money, increased debt, strain on personal finances, and related economic harm.

77.    In many cases, users also suffered anxiety, shame, secrecy, relationship strain, stress, and other foreseeable consequences associated with repeated gambling losses and compulsive wagering behavior.

78.    Defendants nonetheless continued to market, promote, and profit from the very features that increased the frequency, speed, and volume of user betting activity.

79.    Defendants derived substantial revenue from the wagers placed by Plaintiffs and members of the proposed Class and from the losses those users incurred on Defendants' sportsbook platforms.

**F. Plaintiffs' Experiences Reflect the Common Course of Conduct Challenged in This Action.**

80.    Plaintiffs incorporate all previous sections as asserted herein.

81.    Plaintiffs are consumers who opened and maintained sportsbook accounts with Defendants FanDuel, DraftKings, or both, and who were exposed to Defendants' common course of conduct, including repeated promotional inducements, live and in-game betting opportunities, and direct or digital communications designed to encourage continued wagering and additional deposits.

12

82. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered economic injury, including gambling losses, repeated deposits, and loss of use of money, as well as related emotional, financial, and personal harms.

83. Although each Plaintiff's experience differs in certain individualized respects, their claims arise from the same core misconduct: Defendants' design, marketing, promotion, and operation of sportsbook products that encouraged repeated wagering, loss-chasing, continued deposits, and prolonged app engagement.

84. Plaintiff John Farley is a resident of New York.

85. Plaintiff Farley opened and maintained a FanDuel sportsbook account and also maintained an account with DraftKings, though he primarily used FanDuel.

86. Plaintiff Farley's engagement with FanDuel began when FanDuel launched in New York and offered introductory promotions, including cash-back offers and a "$5 bet, get $300" style promotion.

87. Plaintiff Farley found such promotions difficult to decline and, over time, received additional promotional inducements, including profit boosts, money-back offers, bet refunds, and email notifications concerning active promotions.

88. Plaintiff Farley estimates that he deposited approximately $11,000 over roughly four years on Defendants' sportsbook platforms, though he is presently unable to access his full account records to determine his exact net losses with precision.

89. A substantial portion of Plaintiff Farley's deposits were made by credit card, which made continued wagering easier and increased the financial consequences of his sportsbook activity.

90.     Plaintiff Farley received Defendants' promotional communications in New York, deposited funds and placed wagers in New York, and suffered the resulting injuries in New York.

91.     Plaintiff Michael Fox is an adult consumer who primarily used DraftKings and also engaged in some wagering activity on FanDuel.

92.     Plaintiff Fox remained active on Defendants' sportsbook platforms through at least this year and experienced escalating gambling behavior over a period of less than one year.

93.     Plaintiff Fox initially began gambling with the expectation of significant returns, but his conduct changed over time into loss-recovery betting in which he continued wagering in an effort to win back money he had already lost.

94.     As his losses accumulated, Plaintiff Fox experienced significant anxiety, financial strain, and pressure to replace lost funds, and he concealed his sportsbook activity from his domestic partner.

95.     Plaintiff Fox lost approximately $5,000 in under one year on Defendants' sportsbook platforms.

96.     Plaintiff Fox also received promotional offers, including "profit boost" offers that represented or suggested improved winning odds, including claimed improvements of up to 50%, yet the outcomes he experienced were no better despite those inducements.

97.     Each Plaintiff was exposed to materially similar platform features and materially similar promotional conduct, including some combination of live and in-game betting, repeated offers, direct digital outreach, and inducements designed to keep users engaged in ongoing wagering activity.

98.     Each Plaintiff suffered economic injury as a result of Defendants' conduct, including gambling losses, repeated deposits, or both.

14

99.    Defendants profited from Plaintiffs' repeated wagering, their continued deposits, and their prolonged engagement with Defendants' sportsbook platforms.

100.    Plaintiffs' experiences, while individualized in degree, reflect the same common course of conduct challenged in this action and are representative of the harms suffered by similarly situated consumers exposed to Defendants' sportsbook design and promotional practices.

**G. Plaintiffs and Class Members Were Exposed to Common Conduct Capable of Class-Wide Proof**

90.    The claims asserted herein arise from Defendants' common and systematic course of conduct in designing, marketing, promoting, and operating online sportsbook platforms in a manner intended to increase wagering frequency, prolong user engagement, encourage repeated deposits, and maximize user losses.

91.    The wrongful conduct challenged in this action was not isolated to any one Plaintiff. Rather, it was embedded in the structure and operation of Defendants' sportsbook products and in the standardized promotional practices Defendants directed to users across the proposed Class.

92.    Defendants exposed Plaintiffs and Class members to materially similar sportsbook platforms that featured the same or substantially similar mechanisms for continuous wagering, including live and in-game betting opportunities, rapidly changing odds, repeated betting prompts, parlay and same-game parlay features, bonus and refund offers, and direct promotional communications.

93.    Defendants also employed materially similar methods of inducing continued betting across the proposed Class, including emails, text messages, push notifications, in-app alerts, bonus-bet offers, profit boosts, cash-back promotions, bet refunds, and other incentives designed to prompt additional wagers and deposits.

94.     On information and belief, these practices were not random or ad hoc. They were standardized business practices deployed broadly across Defendants' customer base and implemented pursuant to common marketing, retention, and engagement strategies.

95.     Defendants' conduct was further common in that it was directed toward increasing the amount of time users spent on the sportsbook platforms, increasing the number of wagers placed by those users, increasing the amount deposited by those users, and increasing Defendants' revenue from user losses.

96.     Plaintiffs' claims, and the claims of the proposed Class members, therefore arise from common questions concerning Defendants' shared course of conduct, including the design and operation of the sportsbook platforms, the nature and effect of Defendants' inducements and promotional tactics, the extent to which Defendants encouraged repeated wagering and continued deposits, and whether such conduct was unlawful, unfair, deceptive, negligent, or otherwise actionable.

97.     Common proof will include, inter alia, Defendants' uniform platform features, standardized promotional materials, internal marketing and retention policies, account-level communications, user-interface design, deposit and wagering mechanisms, and data reflecting the ways in which Defendants encouraged and profited from repeated betting activity.

98.     Although the precise amount of injury may vary from one Class member to another, the core liability issues in this case do not turn on uniquely individualized conduct. Rather, they turn on Defendants' common design choices, common promotional strategies, and common business practices affecting all members of the proposed Class.

99.     Plaintiffs and Class members were injured in the same essential manner: they were exposed to Defendants' common course of conduct, induced to place repeated wagers and make

repeated deposits through materially similar sportsbook features and promotional tactics, and suffered economic injury as a result.

100.    The claims asserted herein are therefore capable of class-wide resolution because the answers to the central liability questions will derive from evidence common to Plaintiffs and the proposed Class and will materially advance the resolution of this litigation in a single proceeding.

## CLASS ACTION ALLEGATIONS

101.    Plaintiffs incorporate the previous paragraphs as if fully set forth herein.

101.    Plaintiffs bring this action individually and on behalf of all others similarly situated pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

102.    Plaintiffs seek certification of the following Nationwide Class:

**Nationwide Class:** All persons in the United States who, during the applicable limitations period, maintained a sportsbook account with FanDuel, DraftKings, or both, and who were exposed to Defendants' sportsbook promotions, inducements, live or in-game betting features, or repeated wagering communications, and who deposited    money, placed wagers, or suffered losses on Defendants' sportsbook platforms.

103.    Plaintiffs also seek certification of the following subclass:

**New York Subclass:** All persons who, while located in the State of New York during the applicable limitations period, maintained a sportsbook account with FanDuel, DraftKings, or both, and who were exposed to Defendants' sportsbook promotions, inducements, live or in-game betting features, or repeated wagering communications, and who deposited money, placed wagers, or suffered losses on Defendants' sportsbook platforms.

104.    Excluded from the Class and Subclass are Defendants; any parent, subsidiary, affiliate, officer, or director of any Defendant; any entity in which any Defendant has a controlling interest; all judicial officers assigned to this case and their immediate family members; and any legal representative, successor, or assign of any such excluded person or entity.

17

105.    Plaintiffs reserve the right to amend, expand, narrow, or otherwise modify the Class and Subclass definitions in response to discovery, further investigation, motion practice, class certification proceedings, or the evidence developed in this action.

### RULE 23 ALLEGATIONS

106.    **Numerosity — Rule 23(a)(1):** The members of the Classes are so numerous that joinder of all members is impracticable. Upon information and belief, the subject gauge assemblies were installed in and sold with numerous John Deere riding mowers and were also sold separately as replacement parts to consumers throughout the United States, including in Georgia. The identity of Class members is ascertainable from Defendants' records, dealer records, retailer records, warranty records, online sales records, and other reasonably available means.

107.    **Commonality — Rule 23(a)(2):** There are questions of law and fact common to Plaintiffs and the Classes, and those questions generate common answers apt to drive the resolution of this litigation. Common questions include, without limitation:

> a. whether the subject gauge assemblies contain an internal battery that is not reasonably replaceable by consumers;
>
> b. whether Defendants designed the subject gauge assemblies so that predictable battery depletion requires replacement of the entire gauge assembly;
>
> c whether the subject gauge assemblies are defective;
>
> d. whether Defendants knew or should have known of the alleged defect;
>
> e. whether Defendants failed to disclose material information concerning the alleged defect;
>
> f. whether the subject gauge assemblies were fit for their ordinary purpose;
>
> g. whether Defendants breached the implied warranty of merchantability;

h. whether Defendants were unjustly enriched by the sale of the subject gauge assemblies and replacement gauges;

i. whether a reasonable alternative design existed;

j. whether Plaintiffs and Class members suffered economic injury as a result of the alleged defect; and

k. whether Plaintiffs and the Classes are entitled to damages, restitution, equitable relief, or other relief.

108. **Predominance — Rule 23(b)(3):** The common questions of law and fact predominate over any questions affecting only individual members of the Classes. This case centers on a common course of conduct by Defendants and a common product design issue—namely, whether Defendants sold gauge assemblies containing a low-cost internal battery that, when predictably depleted, allegedly cannot be replaced in an ordinary and economical manner, thereby forcing consumers to purchase an entirely new gauge assembly. The relevant evidence regarding Defendants' product design, knowledge, marketing, sales practices, and replacement-part practices will be common to Plaintiffs and the Classes.

109. **Typicality — Rule 23(a)(3):** Plaintiff's claims are typical of the claims of the Classes because Plaintiff, like all Class members, purchased and used a mower and/or replacement gauge assembly containing the same alleged defect and was injured by the same alleged conduct. Plaintiff's claims arise from the same factual and legal theories as the claims of the absent Class members.

110. **Adequacy — Rule 23(a)(4):** Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiff's interests are aligned with those of the Classes, and Plaintiffs

19

have retained counsel competent and experienced in class action litigation, consumer litigation, and complex product-defect cases.

111.    **Superiority — Rule 23(b)(3):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages or other financial recovery available to individual Class members are relatively modest compared with the burden and expense of individual litigation, making it impracticable for Class members to individually seek redress for Defendants' conduct. Class treatment will also avoid inconsistent adjudications, conserve judicial resources, and promote efficient resolution of the claims of Plaintiffs and the Classes.

112.    Absent a class action, Defendants will likely retain the benefit of their alleged wrongful conduct, and Class members will likely be unable to obtain effective relief because the cost of pursuing individual actions would substantially exceed the expected individual recovery.

113.    Class certification is also appropriate under Rule 23(c)(4) with respect to particular issues, including but not limited to whether the subject gauge assemblies share a common defective design, whether Defendants knew or should have known of the defect, whether Defendants failed to disclose the defect, and whether Defendants' conduct caused common economic injury.

114.    Plaintiffs know of no unusual difficulties likely to be encountered in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
**Violation of N.Y. Gen. Bus. Law § 349**

115.    Plaintiffs repeat and reallege each allegation contained in the preceding paragraphs.

116. New York General Business Law § 349 declares unlawful "[u]nfair, deceptive, or abusive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

117. At all relevant times, Defendants were engaged in business, trade, and commerce in New York and furnished sportsbook-related services to consumers in New York, including Plaintiffs and members of the New York Subclass.

118. Defendants' acts, practices, omissions, representations, and promotional conduct as alleged herein were consumer-oriented because they were directed to the public at large and to broad segments of consumers, including New York users of Defendants' sportsbook platforms.

119. Defendants' conduct was not limited to a private or unique transaction. Rather, Defendants used standardized sportsbook products, common digital interfaces, repeated promotional campaigns, recurring inducements, and materially similar communications directed to consumers across New York.

120. Defendants engaged in deceptive, misleading, unfair, and abusive acts and practices by, inter alia:

    a. marketing and promoting sportsbook products in a manner designed to encourage repeated and escalating wagering activity;

    b. presenting profit boosts, bonus bets, bet refunds, cash-back offers, "bet and get" promotions, and similar inducements in a manner that made continued wagering appear more attractive, less risky, or more advantageous than it was in reality;

    c. using repeated emails, text messages, push notifications, in-app alerts, and similar communications to encourage consumers to continue betting, return to the platform, and make additional deposits;

    d. promoting live and in-game betting, parlays, same-game parlays, and other rapid-cycle wagering opportunities in a manner designed to increase betting frequency and prolong user engagement;

    e. failing to adequately disclose, or otherwise obscuring, the manner in which Defendants' platform design, promotional practices, and wagering features encouraged repeated betting, loss-chasing, and continued deposits; and

f.  targeting consumers with inducements and repeated wagering prompts after those consumers had already demonstrated escalating sportsbook activity, repeated losses, or both.

121.  Defendants' acts and practices were materially misleading to a reasonable consumer acting under the circumstances.

122.  A reasonable consumer could be misled by Defendants' representations, omissions, and course of conduct into believing, among other things, that:

a.  promotional inducements such as profit boosts, bonus bets, bet refunds, or cash-back offers materially improved the consumer's expected position;
b.  continued wagering in response to such inducements was a rational or lower-risk means of participation; and
c.  Defendants' sportsbook platforms were merely neutral transaction tools rather than systems deliberately designed and operated to increase betting frequency, repeated deposits, and prolonged gambling activity.

123.  Defendants knew or should have known that their conduct was likely to mislead reasonable consumers in New York.

124.  Plaintiffs saw, received, and were exposed to Defendants' deceptive, misleading, unfair, and abusive acts and practices in New York, including promotional inducements, direct digital outreach, and sportsbook features designed to prompt repeated wagering.

125.  Plaintiffs were injured as a result of Defendants' conduct.

126.  As a direct and proximate result of Defendants' deceptive, misleading, unfair, and abusive acts and practices, Plaintiffs and members of the New York Subclass suffered actual injury, including but not limited to gambling losses, repeated deposits, loss of use of money, and other economic harm.

127.  Plaintiffs and members of the New York Subclass also suffered additional foreseeable harms associated with Defendants' conduct, including financial strain, anxiety, stress, and related personal consequences.

22

128.    Defendants' conduct was a substantial factor in causing Plaintiffs' and the New York Subclass's injuries.

129.    By reason of the foregoing, Defendants violated N.Y. Gen. Bus. Law § 349.

130.    Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiffs and the New York Subclass seek actual damages, statutory damages as permitted by law, treble damages to the extent authorized, injunctive relief, attorneys' fees, costs, and such other and further relief as the Court deems just and proper.

## COUNT II
### Violation of N.Y. Gen. Bus. Law § 350

131.    Plaintiffs repeat and reallege each allegation contained in the preceding paragraphs.

132.    New York General Business Law § 350 declares unlawful "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

133.    New York General Business Law § 350-a defines "false advertising" to include advertising, including labeling, that is misleading in a material respect, and directs that the advertising be judged by whether it is likely to mislead a reasonable consumer acting reasonably under the circumstances.

134.    At all relevant times, Defendants were engaged in the conduct of business and the furnishing of services in New York and disseminated advertising and promotional materials to consumers in New York, including Plaintiffs and members of the New York Subclass.

135.    Defendants, directly and through their agents and marketing systems, advertised, marketed, and promoted their sportsbook platforms through widespread and recurring consumer-facing communications, including but not limited to emails, text messages, push notifications, in-app alerts, website displays, promotional banners, bonus-bet offers, "bet and get" offers, profit boosts, cash-back promotions, money-back or refund offers, and other inducements.

136. Defendants' advertisements and promotional statements were directed to consumers and were made in a material effort to induce account creation, additional deposits, continued wagering, and repeated use of Defendants' sportsbook platforms.

137. Defendants' advertising and promotional statements were false, deceptive, and misleading in material respects, including, inter alia, by:

    a. representing or implying that "profit boosts," "odds boosts," bonus bets, refunds, cash back offers, and similar promotions materially improved the consumer's expected outcome or reduced the practical risk of wagering;

    b. representing or implying that promotional wagering opportunities offered consumers a materially enhanced or specially advantageous chance to win or recover losses;

    c. presenting sportsbook inducements in a manner that emphasized upside, urgency, or supposed protection while failing to adequately disclose material limitations, offsets, conditions, or the true economic effect of the promoted wager;

    d. advertising repeated wagering opportunities and incentive-driven betting in a manner that encouraged consumers to view continued wagering as a favorable or reasonable response to prior losses; and

    e. advertising Defendants' sportsbook platforms as ordinary consumer entertainment products while omitting or obscuring the extent to which the platforms were structured and promoted to drive repeated wagering, repeated deposits, and prolonged user engagement.

138. Defendants' advertising was materially misleading to a reasonable consumer acting reasonably under the circumstances.

139. A reasonable consumer could be misled by Defendants' advertising into believing that the promoted wagers, boosts, refunds, and bonus offers provided materially better value, materially better odds, reduced downside risk, or a fairer chance of success than was actually the case.

140. Defendants knew or should have known that their advertising and promotional practices were likely to mislead consumers, including New York consumers, in material respects.

24

141.    Plaintiffs saw, received, and were exposed to Defendants' false and misleading advertising in New York, including promotional offers and repeated marketing communications concerning sportsbook inducements.

142.    Plaintiffs were induced, at least in part, to open accounts, make deposits, place wagers, continue wagering, and/or return to Defendants' platforms as a result of Defendants' advertising and promotional practices.

143.    As a direct and proximate result of Defendants' false and misleading advertising, Plaintiffs and members of the New York Subclass suffered actual injury, including but not limited to gambling losses, repeated deposits, loss of use of money, and other economic harm.

144.    Defendants' conduct was a substantial factor in causing Plaintiffs' and the New York Subclass's injuries.

145.    By reason of the foregoing, Defendants violated N.Y. Gen. Bus. Law § 350.

146.    Pursuant to N.Y. Gen. Bus. Law § 350-e, Plaintiffs and the New York Subclass seek actual damages, statutory damages as permitted by law, injunctive relief, attorneys' fees, costs, and such other and further relief as the Court deems just and proper.

## COUNT III
### NEGLIGENCE

147.    Plaintiffs incorporate by reference all preceding paragraphs.

148.    At all relevant times, Defendants owed Plaintiffs and members of the proposed Class and New York Subclass a duty to exercise reasonable care in the design, operation, promotion, marketing, and administration of their sportsbook platforms and related consumer-facing services. Under New York law, negligence turns on duty, breach, causation, and damages.

149.    Defendants also owed Plaintiffs and members of the proposed Class and New York Subclass a duty to refrain from engaging in conduct that unreasonably created or increased foreseeable risk of economic and related harm through the operation of their sportsbook products.

150.    The harms suffered by Plaintiffs and members of the proposed Class and New York Subclass were foreseeable. Defendants knew or should have known that repeated live and in-game betting opportunities, rapid-cycle wagering, repeated inducements, frictionless deposits, and persistent promotional outreach could encourage prolonged wagering, loss-chasing, repeated deposits, and escalating gambling losses.

151.    Defendants breached their duties of reasonable care by, inter alia:

a.    designing, operating, and maintaining sportsbook platforms in a manner that encouraged repeated and escalating wagering activity;

b.    prominently featuring and promoting live and in-game betting, parlays, same-game parlays, and other rapid-cycle wagering opportunities in a manner that increased betting frequency and prolonged user engagement;

c.    using repeated promotional inducements, including profit boosts, bonus bets, bet refunds, cash-back offers, and similar incentives, to encourage continued wagering and       additional deposits;

d.    sending or causing to be sent repeated emails, text messages, push notifications, in-app alerts, and similar communications designed to prompt users to return to the platform and continue betting;

e.    failing to implement reasonable safeguards sufficient to reduce the foreseeable risk that users would be drawn into repeated, compulsive, or loss-chasing wagering behavior; and

f.    continuing the foregoing conduct despite knowing or having reason to know that such practices foreseeably increased the risk of substantial losses and related harm to users.

189.    Defendants further breached their duties by structuring their platforms so that consumers could deposit funds quickly and continue wagering with minimal friction, while failing to take reasonable steps to mitigate the foreseeable harms associated with repeated inducement-driven betting activity.

190. Defendants' negligent conduct was a substantial factor in causing Plaintiffs' injuries. New York courts require that the alleged negligent conduct be shown to be a substantial cause of the events producing the injury.

190. As a direct and proximate result of Defendants' negligence, Plaintiffs and members of the proposed Class and New York Subclass suffered damages, including but not limited to gambling losses, repeated deposits, loss of use of money, and other economic harm.

191. Plaintiffs and members of the proposed Class and New York Subclass also suffered additional foreseeable harms associated with Defendants' negligent conduct, including financial strain, anxiety, stress, secrecy, relationship strain, and related personal consequences.

192. Defendants' acts and omissions, as alleged herein, were a substantial factor in bringing about Plaintiffs' injuries and the injuries of the proposed Class and New York Subclass.

193. By reason of the foregoing, Defendants are liable to Plaintiffs and the proposed Class and New York Subclass for all damages permitted by law.

**COUNT IV**
**UNJUST ENRICHMENT**

194. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

195. Plaintiffs plead this Count in the alternative to their other claims and to the extent Defendants contend that no enforceable contract governs some or all of the conduct, transactions, representations, inducements, deposits, wagers, promotional practices, or injuries at issue in this action.

196. Plaintiffs and members of the proposed Class and New York Subclass conferred direct financial benefits upon Defendants by, inter alia, opening and funding sportsbook accounts,

depositing money onto Defendants' platforms, placing wagers through Defendants' sportsbook products, and generating revenue for Defendants through their use of those platforms.

197. Defendants knowingly received, accepted, retained, and benefitted from those funds and financial benefits.

198. Defendants' retention of those benefits was unjust and inequitable because, as alleged herein, Defendants obtained and retained such benefits through unfair, deceptive, misleading, abusive, and otherwise wrongful conduct, including the design, operation, promotion, and marketing of sportsbook platforms in a manner intended to encourage repeated wagering, repeated deposits, prolonged engagement, and escalating losses.

199. Defendants further obtained and retained those benefits by using inducements such as profit boosts, bonus bets, cash-back offers, bet refunds, "bet and get" promotions, repeated digital outreach, and similar tactics to prompt Plaintiffs and members of the proposed Class and New York Subclass to continue wagering and depositing funds.

200. Plaintiffs and members of the proposed Class and New York Subclass did not confer these benefits gratuitously. Rather, Defendants' receipt and retention of those benefits occurred under circumstances in which equity and good conscience require restitution.

201. Defendants were enriched at Plaintiffs' and the Class's expense by the monies deposited, wagered, lost, and retained through the conduct alleged herein.

202. It would be against equity and good conscience for Defendants to retain the benefits they obtained from Plaintiffs and members of the proposed Class and New York Subclass without providing restitution or disgorgement.

203. As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and members of the proposed Class and New York Subclass suffered injury, including but not limited to gambling losses, repeated deposits, loss of use of money, and other economic harm.

204. Plaintiffs and members of the proposed Class and New York Subclass are therefore entitled to restitution, disgorgement, and all other equitable relief permitted by law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment in their favor and against Defendants, and grant the following relief:

A. Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23, appoint Plaintiffs as Class Representatives, and appoint Plaintiffs' counsel as Class Counsel;

B. Enter judgment in favor of Plaintiffs and the Class and Subclass on all Counts asserted herein;

C. Award actual damages, compensatory damages, and all other monetary relief permitted by law in an amount to be determined at trial;

D. Award statutory damages as permitted by law;

E. Award treble damages to the extent authorized by law;

F. Order restitution, disgorgement, and all other equitable monetary relief permitted by law;

G. Enter appropriate declaratory relief, including a declaration that Defendants' conduct as alleged herein was unlawful, unfair, deceptive, misleading, abusive, negligent, and otherwise actionable;

29

H.  Enter appropriate injunctive relief to prevent Defendants from continuing the conduct alleged herein and to require corrective measures consistent with the Court's rulings;

I.  Award pre-judgment and post-judgment interest as permitted by law;

J.  Award Plaintiffs and the Class and Subclass their reasonable attorneys' fees, costs, and expenses as permitted by law;

K.  Award such other and further legal, equitable, or declaratory relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: April 27, 2026                           Respectfully Submitted,

                                   __/s/ Michael A. Tompkins_____
                                   Michael A. Tompkins, Esq.
                                   **LEEDS BROWN LAW, P.C.**
                                   1 Old Country Road, Suite 347
                                   Carle Place, NY 11514
                                   mtompkins@leedsbrownlaw.com

                                        -AND-

                                   Andre R. Belanger[*]
                                   **POULIN|WILLEY|ANASTOPOULO LLC**
                                   32 Ann Street Charleston, SC 29403
                                   Telephone: (803) 222-2222
                                   Fax: (843) 494-5536
                                   Email: andre.belanger@poulinwilley.com
                                        cmad@poulinwilley.com

                                   *Attorneys for Plaintiffs and Proposed Class*

                                   [*]*Pro Hac Vice forthcoming*

30